**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** )<br>)<br>v.   )<br>)<br>**JOHN JAVIER CAMACHO, PABLO** )<br>**AGUILAR-SANCHEZ, ANDERSON** )<br>**ARTEAGA, ANTONIO NARVAEZ, PEDRO** )<br>**DESALES, FAUSTINO SANCHEZ, EDWARD** )<br>**MOORE, and CURTIS BEST,** )<br>    **Defendants.** ) | Crim. Action No. 08cr10168-NG |

**GERTNER, D.J.**

**MEMORANDUM AND ORDER RE:**
**MOTION TO SUPPRESS EVIDENCE FROM TITLE III WIRETAPS**
November 4, 2009

**I.    INTRODUCTION**

Defendants John Camacho ("Camacho"), Pablo Aguilar-Sanchez ("Aguilar-Sanchez), Anderson Arteaga ("Arteaga"), Antonio Narvaez ("Narvaez"), Pedro Desales ("Desales"), and Faustino Sanchez ("Sanchez") have filed a motion to suppress evidence derived from wiretaps (document #93). The superseding indictment charges these defendants and two others, Edward Moore ("Moore") and Curtis Best ("Best"), with conspiracy to distribute more than five kilograms of cocaine between June 2007 and April 2008, in violation of 21 U.S.C. § 846. The indictment also charges Camacho, Aguilar-Sanchez, Desales, and Sanchez with possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and Camacho with money laundering, in violation of 18 U.S.C. § 1956(h).

The defendants challenge the approval of wiretap applications filed by DEA Special Agent Brian Tomasetta ("Agent Tomasetta") pursuant to the Federal Wiretap Act ("Title III"). See 18 U.S.C. § 2510, et seq. United States District Judges Rya W. Zobel and George A. O'Toole authorized applications filed on March 13, 2008, and April 11, 2008, respectively. The defendants argue that investigative techniques short of wiretaps would have been sufficient to

achieve the goals of the investigation, and the government thus failed to satisfy the "necessity requirement" of Title III.  See 18 U.S.C. § 2518(1)(c).

## II.    FACTUAL BACKGROUND

Prior to the applications for wiretap warrants, the government gathered information using an undercover agent, informants, physical surveillance, and e-mail search warrants.  Between November 21, 2006, and February 19, 2006, the government conducted six "money pick-ups" from Camacho, the alleged leader of the conspiracy.  Mar. 13 Wiretap Aff. ¶ 67.  According to the government, a money pick-up is an operation in which an undercover DEA agent meets with a target and collects drug proceeds.  The government asserts that a confidential source first arranged money laundering services for an associate of Camacho known as Harold Gonzales; an undercover agent later met Camacho and received money directly from him on November 21, 2006, February 16, 2007, April 11, 2007, May 2, 2007, November 26, 2007, and February 19, 2008.  Id. ¶¶ 68, 71, 72, 75, 76, 79, 82.  Subsequent to the money pick-ups, Agent Tomasetta reports, the DEA laundered the proceeds through undercover bank accounts.  Id. ¶ 67.

The March 13 Wiretap Affidavit also indicates that the DEA seized cocaine on August 23, 2007, from individuals named Beatriz Velez, Diego Pinto, and Jaime Sanchez.  Id. ¶ 83.  Agent Tomasetta stated that Velez admitted she distributed cocaine with a man named "John"; agents determined "John" was Camacho based on an analysis of phone records.  Id. ¶ 84.  The DEA sent a cooperating witness to meet with Camacho and Arteaga on October 23, 2007.  During the meeting, Camacho allegedly disclosed that he distributed "approximately fifty kilograms of cocaine per week" and provided an e-mail address and phone number.  Id. ¶ 87.  The government also conducted physical surveillance of meetings between Camacho and Moore during January 2008, during which they observed bags exchanged that they believed contained drugs or drug proceeds.  Id. ¶¶ 94-95.

On November 14, 2007, Magistrate Judge Timothy S. Hillman approved a pen register on the e-mail address that Camacho had given the cooperating witness. Id. ¶ 134. Based on data obtained from this pen register of apparent contacts between Camacho and other suspected drug dealers, as well as evidence gathered during the money pickups, Magistrate Judge Leo T. Sorokin issued an e-mail search warrant on February 5, 2008. Id. ¶¶ 141. Magistrate Judge Marianne B. Bowler approved a similar warrant on March 8, 2008.[1] Apr. 11 Wiretap Aff. ¶ 75. The contents of the e-mails gathered from these two warrants were vague, but the agent, based on his training and expertise, believed that many of the e-mails involved communications about drug trafficking and money laundering. Mar. 13 Wiretap Aff. ¶¶ 90-92, 141-154; Apr. 11 Aff. ¶¶ 74-77.

But the agents' efforts had limited efficacy. Camacho and his associates apparently took precautions to cover up their activities. Agent Tomasetta reported that they employed coded phrases during pickups, such as "Looking for El Tio on behalf of El Trompo." Mar. 13 Aff. ¶ 69. Camacho allegedly used phones, cars, and e-mail addresses registered in other people's names. Mar. 13 Aff. ¶¶ 168, 190, 192; Apr. 11 Aff. ¶¶ 52, 163, 168. Agent Tomasetta reported that Camacho also sent text messages on prepaid wireless phones for brief periods before ceasing use when he believed the phones had been detected. Apr. 11 Aff. ¶ 52. Finally, Camacho apparently told the undercover agent "there were some people hanging around," which suggests that he was aware of physical surveillance. Mar. 13 Aff. ¶ 169.

### III.   LEGAL REQUIREMENTS FOR A TITLE III WIRETAP

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 authorizes the use of electronic surveillance and provides conditions for its use. Under 18 U.S.C. § 2518(1), law enforcement authorities seeking a wiretap warrant must submit a sworn affidavit with the

---

[1] The defendants do not challenge the legality of the e-mail search warrants. See Mot. to Suppress at 11.

following information: a) the identity of the officers making and authorizing the application; b) a statement of the facts and circumstances warranting issuance of the wiretap; c) a statement regarding whether other investigative procedures have failed, are unlikely to succeed, or would be too dangerous; d) the period of time for which interception is required; e) a statement of facts concerning previous applications involving the same people or places; and f) in an extension, a statement of the results obtained so far or reasonable explanation of the failure to obtain such results.  These statutory requirements "extend[] beyond the constitutional minimum mandated for other search warrants." United States v. Nelson-Rodriguez, 319 F.3d 12, 32 (1st Cir. 2003).

The only requirement at issue in this motion is 18 U.S.C. § 2518(1)(c), whether the reviewing courts correctly found that investigative techniques, other than wiretaps, have either failed or "reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c); see United States v. Hoffman, 832 F.2d 1299, 1306 (1st Cir. 1987).  The government must make a "reasonable, good faith effort" to use other investigative techniques before resorting to wiretapping, because electronic interception is "an extraordinary investigative technique whose use 'is to be distinctly the exception -- not the rule.'" United States v. Lopez, 300 F.3d 46, 51-52 (1st Cir. 2002) (quoting Hoffman, 832 F.2d at 1306).  On review of an authorized wiretap, a district court must uphold the authorization if the facts alleged in the affidavit "are reasonably adequate to support the issuing judge's implicit determination that other procedures reasonably appear to be unlikely to succeed." United States v. Ashley, 876 F.2d 1069, 1074 (1st Cir. 1989).

## IV.    ANALYSIS

The government argues that wiretaps were necessary because the other methods that had been tried were unsuccessful.  Agent Tomasetta reported that physical surveillance was not sufficient to dismantle the organization because agents were unable to determine the contents of

the bags they observed being exchanged, and because the organization was careful to avoid public transactions. Mar. 13 Wiretap Aff. ¶¶ 167-69; Apr. 11 Wiretap Aff. ¶¶ 169-70. As such, the surveilling agents were unable to determine where the organization obtained drugs, how they were distributed, where Camacho kept proceeds, where he stored drugs, and the names of other participants. Mar. 13 Wiretap Aff. ¶¶ 168, 189; Apr. 11 Wiretap Aff. ¶¶ 166-168.

Furthermore, the affidavit alleges that the undercover agent, confidential sources, and cooperating witnesses did not have recent information, did not know how to contact Camacho, and did not have his trust. Mar. 13 Wiretap Aff. ¶¶ 171-88; Apr. 11 Wiretap Aff. ¶¶ 171-84. Camacho had not agreed to expand his relationship with the undercover agent. Mar. 13 Wiretap Aff. ¶¶ 186-88; Apr. 11 Wiretap Aff. ¶¶ 183-84. Physical searches pursuant to search warrants would compromise the investigation, and would not help to obtain critical evidence such as where drugs and drug proceeds were stored. Mar. 13 Wiretap Aff. ¶ 191; Apr. 11 Wiretap Aff. ¶ 187. Moreover, witness interviews and grand jury hearings would likely be unavailing because such steps, confronting an organization that had already taken steps to evade law enforcement, would likely result in the suspects fleeing the area. Mar. 13 Wiretap Aff. ¶¶ 1-8, 168, 190, 194-96; Apr. 11 Wiretap Aff.¶¶ 1-2, 191-193. Pen registers would have been ineffective to determine the members of the conspiracy, since there was evidence that the defendants did not use their own phones. Mar. 13 Aff. ¶¶ 189-90; Apr. 11 Aff. ¶¶ 185-86. Searches of trash receptacles were largely unsuccessful, because the agents did not find drug residue or any drug-related or financial documents. Mar. 13 Wiretap Aff. ¶ 193; Apr. 11 Wiretap Aff. ¶ 190. Finally, while e-mail warrants discovered historical communications about drug deals, they did not provide information about current movement of money or the names of the people who corresponded. Mar. 13 Aff. ¶ 192; Apr. 11 Wiretap Aff. ¶ 188. Likewise, traffic stops were not

employed by the agents in this case or addressed in the affidavit because of their likely impact on the suspects.

These efforts demonstrate a "reasonable, good faith effort" to use other investigative techniques, an effort that was ultimately unavailing. Lopez, 300 F.3d at 51. Title III does not require that the government use or specifically reject all possible investigative methods. United States v. Abou-Saada, 785 F.2d 1, 11 (1st Cir. 1986). The government sufficiently explained why investigative techniques it had already used were unsuccessful in achieving all goals of the investigation, and why other methods were unlikely to succeed.[2]

## V. CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' Motion to Suppress Evidence Derived from Illegal Wiretaps and Electronic Intercepts (document #93).

**SO ORDERED.**
**Date:   November 4, 2009**                /s/ Nancy Gertner
                                           **NANCY GERTNER, U.S.D.C.**

---

[2] Defendants also argue that there was evidence in the affidavit suggesting a wiretap would not be successful. Mot. to Suppress at 11-12. Title III is meant to ensure that the invasive measure of wiretapping is reserved for situations in which traditional investigative methods would not suffice. United States v. Khan, 415 U.S. 143, 153 n.12 (1973). There is often reason to doubt that wiretaps will return sufficient information when a wiretap is warranted. After all, a Title III wiretap is permitted only in exceptional cases, such as when the target is conscious of surveillance. See Lopez, 300 F.3d at 51, 54. Title III, therefore, does not require a probability that a wiretap will yield valuable information.